1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11   REGINA RINES,                          Case No. 1:21-cv-01113-CDB (SS)

12                  Plaintiff,               ORDER DENYING PLAINTIFF'S
                                             MOTION FOR SUMMARY JUDGMENT
13            v.                             AND AFFIRMING DECISION OF
                                             COMMISSIONER OF SOCIAL
14   COMMISSIONER OF SOCIAL SECURITY,        SECURITY[1]

15                  Defendant.               (Docs. 14, 17)

16

17

18          Plaintiff Regina Rines ("Plaintiff") seeks judicial review of a final decision of the

19   Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

20   disability insurance benefits under the Social Security Act.  (Doc. 1).  The matter is currently

21   before the Court on the parties' briefs, which were submitted without oral argument.  (Docs. 14,

22   17).  Upon review of the Administrative Record ("AR") and the parties' briefs, the Court finds

23   and rules as follows.

24   **I.       BACKGROUND**

25        **A.  Administrative Proceedings and ALJ's Decision**

26          On July 25, 2018, Plaintiff filed a Title II application for disability insurance benefits and

27
     _____

28          [1] Following the parties' filing of notices indicating their consent to the jurisdiction of a U.S.
     magistrate judge for all purposes, this action was reassigned on January 5, 2022, pursuant to 28 U.S.C. §
     636(c)(1).  (Doc. 8).

1  Title XVI application for supplemental security income.  (AR 20, 263-278).  Plaintiff's

2  application was denied and, after reconsideration, was denied again.  (AR 91-172).  On April 7,

3  2020, the assigned Administrative Law Judge ("ALJ"), Matilda Surh, held a hearing; Plaintiff and

4  her counsel attended, as well as vocational expert Sandra Trost.  (AR 41-90).  The ALJ issued her

5  decision on May 11, 2020, finding Plaintiff not disabled.  (AR 34).  On September 18, 2020, the

6  Appeals Council found no basis for changing the ALJ's decision.  (AR 5-10).

7      In her decision, the ALJ found the date of onset of the alleged disability to be March 1,

8  2013.  (AR 20).  The ALJ engaged in the five-step sequential evaluation process set forth by the

9  Social Security Administration.  20 C.F.R. §§ 404.1520(a), 416.920(a).  At step one, the ALJ

10  found Plaintiff had not engaged in substantial gainful activity since March 1, 2013, the alleged

11  onset date.  At step two, the ALJ determined that Plaintiff had "the following severe impairments:

12  anxiety; depression; osteoarthritis of the bilateral hips; and degenerative joint disease of the

13  lumbar spine."  She also found that Plaintiff had the following non-severe impairments: obesity,

14  gastric bypass issues, hypertension, hypothyroidism, polycystic ovarian disease, benign pituitary

15  tumor, Barrett's esophagus, gastroesophageal reflux disease, asthma, and kidney stones.  (AR 23-

16  24).

17      At step three, she found that Plaintiff did not have an impairment, or combination of

18  impairments, that met or medically exceeds the severity of one of the listed impairments in 20

19  C.F.R. Part 404, Subpart P, Appendix 1.  Regarding Plaintiff's mental impairments, she

20  conducted an evaluation using the "paragraph B" and "paragraph C" criteria, finding that

21  Plaintiff's mental impairments do not cause at least two "marked" limitations or one "extreme"

22  limitation, and that Plaintiff does not have only marginal adjustment to adapt to changes in daily

23  life and has not been hospitalized for psychiatric treatment.  (AR 24-27).

24      The ALJ determined Plaintiff's residual functional capacity ("RFC") as follows: "she can

25  lift and carry 20 pounds occasionally and 10 pounds frequently.  She can stand and walk for 6

26  hours in an 8-hour workday and sit for 6 hours in an 8-hour workday.  She can only occasionally

27  climb ramps, stairs, ladders, ropes, and scaffolds.  She is limited to no more than frequent

28  balancing.  She is limited to no more than occasional stooping, kneeling, crouching, and crawling.

1    She is limited to only non-complex, routine tasks.  She is also limited to only occasional public

2    contact."  (AR 27).

3         The ALJ then considered Plaintiff's symptom testimony, finding "that the [Plaintiff's]

4    medically determinable impairments could reasonably be expected to cause the alleged

5    symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting

6    effects of these symptoms are not entirely consistent with the medical evidence and other

7    evidence in the record."  The ALJ noted that "[x]-rays of the claimant's hips have shown

8    moderately severe degenerative changes on the right side but only mild degenerative changes on

9    the left side."  She found that "overall, the medical records documented little evidence of

10   persistent functional difficulties, such as diminished ranges of motion or decreased strength …

11   She allegedly uses a cane everywhere at all times, but the medical records documented little

12   objective evidence of constant usage of a cane.  In fact, treatment notes dated July 29, 2019 and

13   September 9, 2019 mentioned that she was not using any assistive device for ambulation."  (AR

14   28) (citing Ex. 21F).

15        The ALJ stated that Plaintiff's "gait was sometimes noted to be antalgic, but she often had

16   a normal gait … In addition, the treatment records reflect that injections and medications are

17   effective in reducing her pain and improving her functioning."  (AR 28) (citing Exs. 3F, 4F, 6F,

18   7F, 9F, 10F, 16F, 18F, 21F, 22F, and 25F).  She also found little evidence of any surgical

19   intervention being recommended for her hip disorder.  *Id.*

20        Regarding Plaintiff's back, the ALJ found that "x-rays of her lumbar spine taken in June

21   2017 revealed only mild degenerative changes … and an electrodiagnostic study of her lower

22   extremities done in June 2019 found no evidence of lumbar radiculopathy … She also generally

23   exhibited normal motor and sensory function."  (AR 28).

24        The ALJ noted that "treatment records reflect that injections and medications are effective

25   in reducing her pain and improving her functioning.  Moreover, there is little evidence that any

26   surgical intervention has been recommended for her back disorder … With respect to the

27   claimant's mental impairments, the medical records reflect that her mental functioning was

28   generally adequate throughout the adjudicative period.  According to the treatment notes, she

3

generally exhibited normal mood and affect, pleasant or friendly attitude, cooperative behavior, good eye contact, normal judgment, intact thought process, and normal attention span and concentration." (AR 28).

The ALJ found that Plaintiff pursued little mental health treatment after 2014, but acknowledged Plaintiff testified at the hearing that she would start mental health treatment again in May 2020. (AR 29). The ALJ concluded:

> "This large treatment gap is inconsistent with the alleged severity of her mental symptoms. She allegedly tried to obtain treatment from 2015 through early 2020, but there is no definitive evidence that she had difficulty obtaining specialized mental health treatment as necessary during this 5-year period. In addition, despite the allegations of frequent panic attacks, she has not been hospitalized for psychiatric treatment since March 1, 2013. Moreover, according to the hearing testimony, her psychotropic medications generally help calm her down." (AR 28) (citing Ex. 8F).

The ALJ found that Plaintiff's daily activities were:

> "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Despite her physical and mental impairments, she is essentially independent in personal care. She is able to prepare simple meals, do laundry, wash dishes, do light cleaning, use a computer, manage her own finances, crochet, sew, and make crafts. She spends time with others daily. She can get along with authority figures adequately. She can go to a grocery store on a regular basis. She is able to pay attention most of the time and finish what she starts. She can follow written and spoken instructions adequately. She has not alleged any significant side effects from the use of medications." (AR 29) (citing Exs. 5E, 8F, 9E, 10E).

The ALJ found the opinions of the state agency medical consultants' persuasive because they were from highly qualified physicians, familiar with Social Security programs, and "consistent with the general absence of positive clinical signs concerning the claimant's hips in the treatment records … The opinions are also supported by the lumbar spine x-rays, which showed only mild findings, and the electrodiagnostic study, which was normal … Moreover, the opinions are consistent with the well-documented effectiveness of injections and pain medications" as well as Plaintiff's activities of daily living. "However, the opinions somewhat overstate the claimant's mental capacity; the state agency consultants did not adequately consider

the claimant's subjective complaints."  (AR 30).

The ALJ found the mental consultative examination persuasive, finding a "moderately limited ability to deal with usual work stress and a mildly to moderately limited ability to perform work activities on a consistent basis, react to changes in work environment, and complete a normal workday or workweek" but "an adequate ability to perform at least simple tasks, maintain regular attendance, work without special or additional supervision, accept instructions from supervisors, and interact with coworkers and the public.  (AR 30-31) (citing Ex. 8F).

As to Plaintiff's primary care physician, Mitchell Cohen, the ALJ found the opinions in his records unpersuasive because they are "inconsistent with the general absence of positive clinical signs concerning the claimant's hips in the treatment records … contradicted by the lumbar spine x-rays, which showed only mild findings, and the electrodiagnostic study, which was normal … contradicted by the claimant's generally normal motor and sensory function and her often normal gait … contradicted by the generally adequate mental functioning that the claimant exhibited during the adjudicative period … inconsistent with the effectiveness of injections, pain medications, and psychotropic medications …inconsistent with the claimant's generally adequate daily living activities and social activities … which indicate some physical and mental capacity."  (AR 31).

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. Finally, at step five, she found that, per testimony of the vocational expert, Plaintiff could perform jobs that exist in significant numbers in the national economy, such as silver wrapper, marker, and office helper.  (AR 32-33).

**B.  Medical Record and Hearing Testimony**

The relevant hearing testimony and medical record were reviewed by the Court and will be referenced below as necessary to this Court's decision.

## II.    STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner of Social Security is governed by 42 U.S.C. § 405(g).  The scope of review under § 405(g) is limited; the Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or

5

is based on legal error." *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." (*Id*. at 1159) (quotation and citation omitted). Stated differently, substantial evidence equates to "more than a mere scintilla[,] but less than a preponderance." (*Id*.) (quotation and citation omitted). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Healy v. Astrue*, 379 Fed. Appx. 643, 645 (9th Cir. 2010). In determining whether the standard has been satisfied, a reviewing court must consider the entire record as a whole rather than searching for supporting evidence in isolation. (*Id*.).

The court will review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which she did not rely. Social Security Act § 205, 42 U.S.C. § 405(g). In reviewing a denial of benefits, a district court may not substitute its judgment for that of the Commissioner. "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). Further, a district court will not reverse an ALJ's decision on account of an error that is harmless. (*Id*.). An error is harmless where it is "inconsequential to the [ALJ's] ultimate nondisability determination." (*Id*) (quotation and citation omitted). The party appealing the ALJ's decision generally bears the burden of establishing that it was harmed. *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009).

A claimant must satisfy two conditions to be considered "disabled" and eligible for benefits within the meaning of the Social Security Act. First, the claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Second, the claimant's impairment must be "of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step sequential analysis to determine whether a

1    claimant satisfies the above criteria.  *See* 20 C.F.R. § 416.920(a)(4)(i)-(v).  At step one, the

2    Commissioner considers the claimant's work activity.  20 C.F.R. § 416.920(a)(4)(i).  If the

3    claimant is engaged in "substantial gainful activity," the Commissioner must find that the

4    claimant is not disabled.  20 C.F.R. § 416.920(b).

5        If the claimant is not engaged in substantial gainful activity, the analysis proceeds to step

6    two.  At this step, the Commissioner considers the severity of the claimant's impairment.  20

7    C.F.R. § 416.920(a)(4)(ii).  If the claimant suffers from "any impairment or combination of

8    impairments which significantly limits [his or her] physical or mental ability to do basic work

9    activities," the analysis proceeds to step three.  20 C.F.R. § 416.920(c).  If the claimant's

10   impairment does not satisfy this severity threshold, however, the Commissioner must find that the

11   claimant is not disabled.  (*Id.*).

12       At step three, the Commissioner compares the claimant's impairment to impairments

13   recognized by the Commissioner to be so severe as to preclude a person from engaging in

14   substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(iii).  If the impairment is as severe or more

15   severe than one of the enumerated impairments, the Commissioner must find the claimant

16   disabled and award benefits.  20 C.F.R. § 416.920(d).

17       If the severity of the claimant's impairment does not meet or exceed the severity of the

18   enumerated impairments, the Commissioner must pause to assess the claimant's "residual

19   functional capacity."  Residual functional capacity (RFC), defined generally as the claimant's

20   ability to perform physical and mental work activities on a sustained basis despite his or her

21   limitations (20 C.F.R. § 416.945(a)(1)), is relevant to both the fourth and fifth steps of the

22   analysis.

23       At step four, the Commissioner considers whether, in view of the claimant's RFC, the

24   claimant is capable of performing work that he or she has performed in the past (past relevant

25   work).  20 C.F.R. § 416.920(a)(4)(iv).  If the claimant is capable of performing past relevant

26   work, the Commissioner must find that the claimant is not disabled.  20 C.F.R. § 416.920(f).  If

27   the claimant is incapable of performing such work, the analysis proceeds to step five.

28       At step five, the Commissioner considers whether, in view of the claimant's RFC, the

7

1  claimant is capable of performing other work in the national economy.  20 C.F.R. §

2  416.920(a)(4)(v).  In making this determination, the Commissioner must also consider vocational

3  factors such as the claimant's age, education, and past work experience.  (*Id.*).  If the claimant is

4  capable of adjusting to other work, the Commissioner must find that the claimant is not

5  disabled.  20 C.F.R. § 416.920(g)(1).  If the claimant is not capable of adjusting to other work, the

6  analysis concludes with a finding that the claimant is disabled and is therefore entitled to

7  benefits.  (*Id.*).

8         The claimant bears the burden of proof at steps one through four above.  *Tackett v. Apfel*,

9  180 F.3d 1094, 1098 (9th Cir. 1999).  If the analysis proceeds to step five, the burden shifts to the

10  Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such

11  work "exists in significant numbers in the national economy."  20 C.F.R. § 416.960(c)(2); *Beltran*

12  *v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

13     **III.     ISSUES AND ANALYSIS**

14         Plaintiff seeks judicial review of the Commissioner's final decision denying her

15  application.  (Doc. 1).  Plaintiff raises the following issues:

16         1.  The ALJ failed to provide specific and legitimate reasons for discounting the treating

17              medical source opinion of physician Mitchell Cohen (Doc. 14 at 2); and

18         2.  The ALJ erred in finding that Plaintiff's chronic kidney stones were a non-severe

19              impairment at step two of the analysis and the resulting RFC fails to include

20              limitations related to that impairment.  *Id.*

21     **A.  Whether the ALJ Properly Discounted the Treating Medical Source Opinion of**

22          **Physician Mitchell Cohen**

23         Plaintiff argues that the ALJ failed to provide "specific and legitimate reasons" for

24  discounting the treating medical source opinion of physician Mitchell Cohen.  (Doc. 14 at 18-27).

25  As a preliminary matter, Plaintiff incorrectly advances the standard applicable to claims filed

26  before March 27, 2017 ("specific and legitimate reasons").  Because Plaintiff filed her application

27  for benefits after that date, Plaintiff's claim for benefits is governed by the agency's "new"

28  regulations concerning how ALJs must evaluate medical opinions.  *See* 20 C.F.R. § 404.1520c;

1   *Woods v. Kijakazi*, 32 F.4th 785, 790 (9th Cir. 2022) (noting the "specific and legitimate"

2   standard is "clearly irreconcilable with the 2017 regulations").  Plaintiff cites cases for the

3   proposition that the "specific and legitimate" standard still applies.  (Doc. 14 at 23).  These cases

4   predate *Woods* and are, therefore, not persuasive.

5          The new regulations set "supportability" and "consistency" as "the most important

6   factors" when determining the opinions' persuasiveness.  20 C.F.R. § 404.1520c(b)(2).  And

7   although the regulations eliminate the "physician hierarchy," deference to specific medical

8   opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [they]

9   considered the medical opinions" and "how persuasive [they] find all of the medical opinions."

10  20 C.F.R. § 404.1520c(a)–(b).  Accordingly, under the new regulations, "the decision to discredit

11  any medical opinion, must simply be supported by substantial evidence."  *Woods*, 32 F.4th at 787.

12         In conjunction with this requirement, "[t]he agency must 'articulate ... how persuasive' it

13  finds 'all of the medical opinions' from each doctor or other source, and 'explain how [it]

14  considered the supportability and consistency factors' in reaching these findings."  *Id.* at 792

15  (citing 20 C.F.R. § 404.1520c(b)).  *See also* 20 C.F.R. § 416.920c(b).  "Supportability means the

16  extent to which a medical source supports the medical opinion by explaining the 'relevant ...

17  objective medical evidence.'"  *Woods*, 32 F.4th at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)).

18  *See also id.* § 416.920c(c)(1).  "Consistency means the extent to which a medical opinion is

19  'consistent ... with the evidence from other medical sources and nonmedical sources in the

20  claim.'"  *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)).  *See also* 20 C.F.R. § 416.920c(c)( 2).

21         The ALJ's analysis of Dr. Cohen's opinion is as follows:

22   Mitchell Cohen, D.O., the claimant's own physician, stated that the claimant would
     frequently be unable to perform simple tasks, was limited to low-stress work, was
23   restricted to less than sedentary exertion, could perform very limited postural
     activities, and would be absent from work more than 4 days per month. I find that
24   this opinion is not persuasive because it is inconsistent with the general absence of
     positive clinical signs concerning the claimant's hips in the treatment records.  The
25   opinion is also contradicted by the lumbar spine x-rays, which showed only mild
     findings, and the electrodiagnostic study, which was normal. In addition, the
26   opinion is contradicted by the claimant's generally normal motor and sensory
     function and her often normal gait. Moreover, the opinion is contradicted by the
27   generally adequate mental functioning that the claimant exhibited during the
     adjudicative period, as discussed above. Furthermore, the opinion is inconsistent
28

1

2

3

4
with the effectiveness of injections, pain medications, and psychotropic medications. As mentioned above, she has received little specialized mental health treatment since 2014 and has not been hospitalized for psychiatric treatment since March 1, 2013. Finally, the opinion is inconsistent with the claimant's generally adequate daily living activities and social activities as discussed above, which indicate some physical and mental capacity.

5
(AR 31) (citations omitted).

6

7

8

9

10

11
First, Plaintiff argues that the ALJ "summarily found [Dr. Cohen's] opinion was inconsistent with the 'general absence of positive clinical signs concerning the claimant's hips in the treatment records.'" (Doc. 14 at 23) (citing AR 31; internal citations omitted). Plaintiff states that there are "multiple positive clinical findings in the record concerning [Plaintiff's] bilateral hips." *Id.* Plaintiff provides that the ALJ's inaccurate statements do not satisfy the relevant standard to discount the opinion. *Id.* at 24.

12

13

14

15

16

17

18
Second, Plaintiff argues that the ALJ failed to meet the relevant standard when finding that Dr. Cohen's opinion is contradicted by mild findings on lumbar spine x-rays, EMG results, normal motor and sensory functions, and normal gait. Plaintiff argues that the ALJ failed to discuss evidence in the record regarding positive clinical findings on physical exams and multiple steroid injections to treat Plaintiff's back pain. *Id.* Third, Plaintiff argues that the evidence in the record does not support a conflict between Dr. Cohen's opinion and the effectiveness of any pain medications, injections, and psychotropic medications. *Id.* at 24-25.

19

20

21

22

23

24

25

26
Fourth, Plaintiff argues that Dr. Cohen's opinion as to mental functioning was not based solely on mental health impairments, but also on "pain or other symptoms" that are severe enough to interfere with Plaintiff's ability to sustain attention and concentration. Plaintiff provides that, as such, the ALJ did not explain how allegedly adequate mental functioning and lack of mental health treatment contradict an opinion based on chronic pain. *Id.* at 25-26. And finally, Plaintiff argues that the ALJ did not explain how Plaintiff's activities of daily living are inconsistent with Dr. Cohen's opinion, particularly in light of Ninth Circuit precedent that Plaintiff need not be bed-ridden. *Id.* at 26.

27

28
Defendant argues that the ALJ's opinion met the appropriate standard when analyzing Dr. Cohen's opinion. (Doc. 17 at 4-5). Defendant argues that the ALJ properly found inconsistent

1   Dr. Cohen's opinion limiting Plaintiff's lifting of ten pounds of weight due to lower back pain in

2   light of spinal examinations that returned only mild findings.  Defendant points out that the ALJ

3   considered steroid injections when determining a limitation to a light work RFC, finding the

4   treatment effective.  *Id.* at 5.  Defendant also argues that, when discounting Dr. Cohen's less than

5   sedentary assessment, the ALJ properly cited to records reflecting Plaintiff's physicians stated

6   that she did not use any assistive walking device.  *Id.* at 5-6.

7          Lastly, Defendant argues that the ALJ properly discounted Dr. Cohen's opinion as to

8   mental limitations, supported by a record that showed little evidence of treatment since 2014, no

9   hospitalizations, and largely normal activities of daily living.  In that assessment, Defendant

10  asserts that the ALJ referenced in her decision earlier analyses where she noted normal mental

11  status exams, attention, concentration, and activities, also mentioning Plaintiff's limited attention

12  at the consultative examination but noting Plaintiff was able to demonstrate adequate

13  concentration, calculations, and logical thought processes.  *Id.* at 6.

14         Dr. Cohen's opinion consists of four pages of a "Physical Residual Functional Capacity

15  Questionnaire" provided by the Social Security Administration.  (AR 3519-3522).  It asks for

16  Plaintiff's diagnoses, prognoses, symptoms, clinical findings, and a range of limitations.  It is

17  predominantly a "checkbox" form.  Where Dr. Cohen was asked to identify clinical findings,

18  treatments, and responses, he wrote "see chart notes."  (AR 3519).

19         In her review and consideration of Dr. Cohen's opinion, the ALJ references narrative and

20  analysis she provided earlier in her decision.  Though the format of the ALJ's deliberation is

21  somewhat cumbersome, her reasoning is reasonably discerned.  *See Molina v. Astrue*, 674 F.3d

22  1104, 1121 (9th Cir. 2012) ("Even when an agency explains its decision with less than ideal

23  clarity, we must uphold it if the agency's path may reasonably be discerned.") (citations and

24  quotations omitted; superseded on other grounds).

25                    i.    **Degenerative Changes in Plaintiff's Hips**

26         Addressing Dr. Cohen's assessment, the ALJ found that "this opinion is not persuasive

27  because it is inconsistent with the general absence of positive clinical signs concerning the

28  claimant's hips in the treatment records."  (AR 31) (citing Exs. 1F, 2F, 3F, 4F, 5F, 6F, 7F, 10F,

1    17F, 18F, 21F).

2         Earlier in her decision, the ALJ discusses the evidence in the record regarding Plaintiff's

3    hips:

4         X-rays of the claimant's hips have shown moderately severe degenerative changes
          on the right side but only mild degenerative changes on the left side. During the
5         adjudicative period, she was sometimes noted to have tenderness and painful
          motion in the hips, but, overall, the medical records documented little evidence of
6         persistent functional difficulties, such as diminished ranges of motion or decreased
          strength. She allegedly uses a cane everywhere at all times, but the medical records
7         documented little objective evidence of constant usage of a cane. In fact, treatment
          notes dated July 29, 2019 and September 9, 2019 mentioned that she was not using
8         any assistive device for ambulation. Her gait was sometimes noted to be antalgic,
          but she often had a normal gait. In addition, the treatment records reflect that
9         injections and medications are effective in reducing her pain and improving her
          functioning. Moreover, there is little evidence that any surgical intervention has
10        been recommended for her hip disorder.

11

12   (AR 28) (citations omitted).

13        Here, the ALJ reasonably analyzed and cited relevant treatment notes in evaluating Dr.

14   Cohen's opinion and her findings are amply supported by the record. *See* (AR 616, 631-632, 639,

15   800-805, 856, 858, 980, 987, 1008, 1018, 1211, 1215-1217, 1256-1258, 2634-2635, 2638). For

16   example, on September 14, 2017, Plaintiff went to the emergency room for "bilateral hip pain

17   onset four days in duration." (AR 800). She was given a prescription for Motrin and Ultram and

18   recommended to follow up with her primary care physician the following week. (AR 804). The

19   x-rays taken during that visit evidenced no fractures or dislocations but found arthritic spurs in

20   her joints. (AR 805).

21        On June 9, 2017, after a physical exam, Dr. Cohen noted that Plaintiff had "right hip pain

22   with int [sic] rotation." He ordered an x-ray for her hip. (AR 1018). On July 10, 2017, Dr.

23   Cohen states that Plaintiff's "right hip is still hurting her. She had her xrays [sic] done and a

24   referral was made for her right hip." (AR 1008). On January 9, 2018, physician William Pistel

25   found "moderate osteoarthritis with the right hip being more suggestive of joint space narrowing,

26   osteophytic spur formation, and sclerosis." He found Plaintiff to not be an "ideal surgical

27   candidate" due to her age and body mass index and recommended a referral for a hip injection,

28   combined with physiotherapy. (AR 1211). On January 30, 2018, Dr. Cohen notes that Plaintiff

                                                  12

1    "will get an injection in the hip. She is waiting for authorization. She will also be starting PT

2    next week." (AR 991). On April 16, 2018, Plaintiff attended physical therapy, having already

3    received her injection. (AR 1231-1234). And on May 1, 2018, Dr. Cohen notes that Plaintiff

4    "had the injection in her hip and it has been helping her. She will be having injections in her

5    back." (AR 980).

6         On June 19, 2018, the radiology provider noted degenerative changes in the hips as

7    "pronounced" for her age, with "right greater than left" and no "acute fracture" or dislocation.

8    (AR 856). She continued to attend physical therapy appointments intermittently over the

9    following months (AR 1235-1240), but was discharged on July 26, 2018, because she

10   "cancelled/no-showed nine visits over the course of her care[,] [d]ischarge due to poor

11   attendance" (AR 1240). On September 5, 2018, physician Joshua Nicholson noted that Plaintiff

12   underwent a hip injection and she reported "97% improvement in her right hip pain. She is very

13   pleased with her functional improvement especially with walking" but still had "low back pain

14   and left hip pain" and expressed interest in obtaining a cane. (AR 1256). Dr. Nicholson further

15   noted "moderately severe degenerative changes on the right hip and mild degenerative changes of

16   the left hip." (AR 1258). On February 3, 2020, Plaintiff again began attending physical therapy

17   and her functional performance was noted as "impaired." (AR 2634-2635). On March 2, 2020,

18   Plaintiff was discharged "due to [one] no show [sic] and [two] same day cancels[,] [p]atient will

19   require new RX for future treatment." (AR 2638).

20        On September 5, 2018, Dr. Nicholson noted Plaintiff had difficulty walking, favoring her

21   right hip. (AR 2661). On May 15, 2019, her gait was noted as normal by nurse practitioner

22   Michael They. (AR 2522). On September 9, 2019, nurse practitioner Amaechi Ozor noted that

23   Plaintiff's gait was normal, with her not using any assistive device for ambulation (AR 2507);

24   Ozor made the same findings again on October 28, 2019 (AR 2511).

25        Some of the citations in the ALJ's analysis refer to injections or medications reducing

26   lower back pain rather than hip pain, for example 16F/6 (AR 1720), 16F/10 (AR 1724), and

27   22F/66 (AR 2600). However, this is harmless error, as other citations, such as 6F/10 (AR 980)

28   and 9F/6 (AR 1256) evidence the injections specifically helping her hip pain. *See Robbins v.*

1    *Social Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (holding that error that is inconsequential

2    to the ultimate nondisability determination is harmless error).

3        Accordingly, the ALJ's evaluation of Dr. Cohen's opinion as to degenerative changes in

4    Plaintiff's hips is supported by substantial evidence. *See, e.g., Bob R. v. Comm'r of Soc. Sec.*, No.

5    C24-5558-BAT, 2025 WL 474259, at *4 (W.D. Wash. Feb. 12, 2025) ("even if the evidence is

6    susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

7    upheld.  Plaintiff has not demonstrated that the ALJ's evaluation of Dr. Ruddell's opinion was

8    unreasonable, unsupported by substantial evidence, or the result of harmful legal error.") (internal

9    citations and quotations omitted) (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)).

10        **ii.    Degenerative Changes in Plaintiff's Lumbar Spine**

11        As to limitations identified by Dr. Cohen, the ALJ found that "[t]he opinion is also

12    contradicted by the lumbar spine x-rays, which showed only mild findings, and the

13    electrodiagnostic study, which was normal.  In addition, the opinion is contradicted by the

14    claimant's generally normal motor and sensory function and her often normal gait."  (AR 31)

15    (citing Exs. 3F, 4F, 6F, 7F, 9F, 10F, 16F, 18F, 21F, 25F).

16        Earlier in her decision, the ALJ discusses the record evidence regarding Plaintiff's lumbar

17    spine and motor and sensory functions:

18    
19    
20    
21    
22    
23    
24    
25    
> During the adjudicative period, the claimant often had a diminished range of motion
> in the lumbar spine.  However, x-rays of her lumbar spine taken in June 2017
> revealed only mild degenerative changes.  She complains of radicular symptoms,
> but an electrodiagnostic study of her lower extremities done in June 2019 found no
> evidence of lumbar radiculopathy.  She also generally exhibited normal motor and
> sensory function.  She allegedly uses a cane everywhere at all times, but the medical
> records documented little objective evidence of constant usage of a cane.  In fact,
> treatment notes dated July 29, 2019 and September 9, 2019 mentioned that she was
> not using any assistive device for ambulation.  Her gait was sometimes noted to be
> antalgic, but she often had a normal gait.  In addition, the treatment records reflect
> that injections and medications are effective in reducing her pain and improving
> her functioning.  Moreover, there is little evidence that any surgical intervention
> has been recommended for her back disorder.

26    (AR 28-29) (citations omitted).

27        Here as well, the ALJ adequately analyzed and cited relevant treatment notes in evaluating

28    Dr. Cohen's opinion and her findings are supported by the record.  *See* (AR 1210-1211, 1217,

1   1248, 1266-1267, 1726, 1732-1734, 2507, 2511, 2519, 2530).  For example, on April 10, 2017,

2   after a physical exam, Dr. Cohen noted that Plaintiff had lower back pain, for which she was

3   taking tramadol and cyclobenzaprine HCL.  (AR 1024).  On June 9, 2017, after another physical

4   exam, Dr. Cohen noted that Plaintiff had low back pain.  He ordered an x-ray for her lower back.

5   (AR 1018).  On June 28, 2017, physician John Martin noted "mild degenerative changes," "mild

6   spurring," "minimal mid lumbar levoscoliosis," "no spondylolysis or spondylolisthesis," and a

7   "normal statute and alignment" of Plaintiff's lumbar vertebrae.  (AR 1195).  On January 9, 2018,

8   Dr. Pistel noted that Plaintiff had lower back pain and recommended injections and physical

9   therapy.  (AR 1210-1211).

10         On April 6, 2018, Dr. Nicholson notes Plaintiff elected to proceed with injections for her

11   lower back pain.  (AR 1229).  On September 5, 2018, Dr. Nicholson found that Plaintiff's "low

12   back pain is her worse pain … Pain is made better by changing positions[,] rest and medications."

13   (AR 1716).  Plaintiff was to continue her medication regime, with Tylenol and an increased dose

14   of tramadol, and undergo injections for her lower back pain.  (AR 1718).  On October 10, 2018,

15   during a consultative exam with a psychologist, she was noted as having normal motor activity.

16   (AR 1248).  On October 11, 2018, Plaintiff had an injection for lower back pain.  (AR 1266-

17   1267).  She later reported "70% improvement."  (AR 1726).  On February 14, 2019, Plaintiff had

18   another injection for lower back pain.  (AR 1514, 1559).  She later reported "80% improvement."

19   (AR 1726).  On May 2, 2019, Plaintiff had another injection for lower back pain (AR 2265), as

20   well as an additional injection on June 13, 2019 (AR 2519).  On June 27, 2019, physician

21   Mahendra Nath noted that an electrodiagnostic exam found no "evidence of large fiber peripheral

22   polyneuropathy, lumbar radiculopathy, or any other nerve entrapment neuropathies."  (AR 2530).

23         The ALJ appears to have used the same string of citations relating to pain for the hips and

24   lower back, as some of the citations in the ALJ's analysis refer to injections or medications

25   reducing hip pain rather than lower back pain, for example 6F/10 (AR 980) and 9F/6 (AR 1256).

26   However, this again is harmless error, as other citations, such as 16F/6 (AR 1720), 16F/10 (AR

27   1724), and 22F/66 (AR 2600), evidence the injections specifically helping her lower back pain.

28   *See Robbins*, 466 F.3d at 885.

15

1    Accordingly, the ALJ's evaluation of Dr. Cohen's opinion as to degenerative changes in

2    Plaintiff's lumbar spine is supported by substantial evidence. *See Bob R.*, 2025 WL 474259, at

3    *4.

4    **iii.    Mental Functioning**

5    Addressing Dr. Cohen's assessment, the ALJ found that "the opinion is contradicted by

6    the generally adequate mental functioning that the claimant exhibited during the adjudicative

7    period, as discussed above … she has received little specialized mental health treatment since

8    2014 and has not been hospitalized for psychiatric treatment since March 1, 2013." (AR 31)

9    (citing Exs. 6F, 8F).

10    Earlier in her decision, the ALJ discusses the record evidence regarding Plaintiff's mental

11    functioning:

> 12    [T]he medical records reflect that her mental functioning was generally adequate
> 13    throughout the adjudicative period. According to the treatment notes, she generally
>      exhibited normal mood and affect, pleasant or friendly attitude, cooperative
> 14    behavior, good eye contact, normal judgment, intact thought process, and normal
>      attention span and concentration. At a mental consultative examination conducted
> 15    on October 10, 2018, she had limited attention, but she demonstrated appropriate
>      attire, clean appearance, good grooming, polite attitude, cooperative behavior,
> 16    appropriate interaction, normal psychomotor activity, good eye contact, calm
>      affect, normal speech, full orientation, intact intelligence, adequate concentration,
> 17    adequate fund of knowledge, adequate memory, adequate abstraction, intact simple
>      calculation skills, adequate judgment, intact insight, good mood, logical thought
> 18    process, and unremarkable thought content. The evidence of record shows that the
>      claimant received little specialized mental health treatment, such as counseling and
> 19    psychotherapy, after 2014. At the hearing, she testified that she was scheduled to
>      start specialized mental health treatment again in May 2020. This large treatment
> 20    gap is inconsistent with the alleged severity of her mental symptoms. She allegedly
>      tried to obtain treatment from 2015 through early 2020, but there is no definitive
> 21    evidence that she had difficulty obtaining specialized mental health treatment as
>      necessary during this 5-year period. In addition, despite the allegations of frequent
> 22    panic attacks, she has not been hospitalized for psychiatric treatment since March
>      1, 2013. Moreover, according to the hearing testimony, her psychotropic
> 23    medications generally help calm her down. I noticed that the claimant was able to
>      respond to questions, interact appropriately, follow closely, and participate fully
> 24    during the telephonic hearing. While the hearing was short-lived and cannot be
>      considered a conclusive indicator of the claimant's overall level of mental problems
> 25    on a day-to-day basis, the apparent lack of serious mental difficulties during the
> 26    hearing is somewhat inconsistent with the alleged severity of her symptoms.
> 27

28    (AR 29) (citations omitted).

16

1    As addressed by the undersigned above, the ALJ adequately analyzed and cited relevant

2    treatment notes in evaluating Dr. Cohen's opinion and her findings are supported by the record.

3    *See* (AR 972-1081, 1121-1141, 1246-1249).  For example, on October 10, 2018, Plaintiff

4    attended a consultative examination with psychologist Kelly T. Pham.  (AR 1246-1249).  She was

5    noted as taking sertraline and Risperdal, with no history of suicide or self-harm.  (AR 1246).  She

6    was further noted as being alert, oriented, and calm, having a cooperative attitude, good eye

7    contact, coherent speech, adequate concentration, adequation memory, adequate abstraction,

8    adequate judgment, intact calculations, logical thought content, and limited attention.  (AR 1248).

9    A review of the record supports the ALJ's conclusion that Plaintiff received little

10   specialized mental health treatment from the date of her disability.  The record contains

11   psychiatric and behavioral health progress notes, dating from regular sessions between March 30,

12   2012 (prior to the date of onset of her disability), to December 31, 2014.  (AR 1121-1141).  These

13   notes, prepared by licensed clinical social worker Pete Thompson, state a diagnosis of post-

14   traumatic stress disorder and dysthymic disorder.  They do not appear to evidence clinical

15   findings substantially different from the ALJ's conclusions, nor do the sessions appear to

16   continue beyond the end of 2014.  A record from Dr. Cohen, dated August 3, 2015, states that

17   Plaintiff has depression, bipolar disorder, and post-traumatic stress disorder and is taking Zoloft

18   (sertraline) and Risperdal.  (AR 1078-1079).  These medications continue throughout the period

19   of Dr. Cohen's records but his records otherwise are largely devoid of any other mention of, or

20   treatments for, mental health concerns.  (AR 972-1081).

21   Plaintiff argues that Dr. Cohen's opinion as to mental functioning was not based solely on

22   mental health impairments, but also on "pain or other symptoms" that are severe enough to

23   interfere with Plaintiff's ability to sustain attention and concentration.  (Doc. 14 at 25-26; citing

24   AR 3520).  Contrary to Plaintiff's arguments, the ALJ addressed pain in her evaluation of Dr.

25   Cohen's limitations, as noted in the discussion above relating to Plaintiff's hips and lumbar spine.

26   Plaintiff cites to the case of *McCrea v. Colvin*[2] for the proposition that the ALJ erred by failing to

27   explain how a normal mental status test detracted from a treating source's opinion that attributed the

28

———————————————————

[2] No. 3:15-CV-00166-SB, 2016 WL 884642 (D. Or. Mar. 8, 2016).

1    inability to sustain attention and concentration to chronic pain. (Doc. 14 at 26). However, the

2    opinion in the case largely is inapplicable here, or at least is unpersuasive, as it predates the adoption

3    of the new "substantial evidence" standard and thus applies the "specific and legitimate" standard in

4    evaluating the medical opinion.

5         Additionally, the facts of the *McCrea* case are distinguishable. When evaluating the

6    plaintiff's foot and leg pain, the court held that the ALJ incorrectly noted the distance in which the

7    plaintiff walked to his Narcotics Anonymous meetings as 22 blocks when it was only seven blocks,

8    failed to consider that plaintiff was a recovering heroin addict and thus had a good reason for not

9    pursuing more aggressive pain medications beyond ibuprofen, improperly substituted his lay opinion

10   for that of a medical professional, and failed to base his rejection of the physician's opinion on

11   physical limitations upon a holistic review of the medical evidence. *McCrea*, 2016 WL 884642, at

12   *7–8. It is upon this foundation that the court later concluded that the ALJ failed to explain how

13   findings of "appropriate thought content and thought process" detracted from the physician's opinions

14   regarding attention and concentration, when such opinions were not explicitly linked to mental

15   impairments and, thus, may have been based on chronic pain. *Id.* at *8. Here, the ALJ has not

16   incorrectly stated facts upon which her analysis rests, nor improperly substituted her lay opinion for

17   that of a professional, nor failed to base her rejection of Dr. Cohen's opinions on a holistic review of

18   the medical evidence.

19        Accordingly, the ALJ's evaluation of Dr. Cohen's opinion as to mental functioning is

20   supported by substantial evidence. *See Her v. Comm'r of Soc. Sec.*, No. 1:24-CV-00906-EPG, 2025

21   WL 391819, at *4 (E.D. Cal. Feb. 4, 2025) ("While Plaintiff argues that other evidence could support

22   a different conclusion as to degree of her mental impairments and the persuasiveness of Dr. Thao's

23   opinion, this at most amounts to another rational interpretation, meaning that the decision of the ALJ

24   must be upheld.") (citations and quotations omitted).

25              **iv.    Daily Activities**

26        Addressing limitations found by Dr. Cohen, the ALJ concluded that "the opinion is

27   inconsistent with the claimant's generally adequate daily living activities and social activities as

28   discussed above, which indicate some physical and mental capacity." (AR 31) (citing Exs. 5E,

1  8F).

2      Earlier in her decision, the ALJ discusses the evidence in the record regarding Plaintiff's

3  daily activities:

4      The claimant has described daily activities that are not limited to the extent one
       would expect, given the complaints of disabling symptoms and limitations. Despite
5      her physical and mental impairments, she is essentially independent in personal
       care. She is able to prepare simple meals, do laundry, wash dishes, do light cleaning,
6      use a computer, manage her own finances, crochet, sew, and make crafts. She
       spends time with others daily.  She can get along with authority figures adequately.
7      She can go to a grocery store on a regular basis.  She is able to pay attention most
       of the time and finish what she starts.   She can follow written and spoken
8      instructions adequately.  She has not alleged any significant side effects from the
       use of medications.
9

10  (AR 29) (citations omitted).

11     The ALJ cites to a function report completed by Plaintiff (AR 310-318) on August 13,

12  2018, as well as a consultative examination conducted by Dr. Pham on October 10, 2018 (AR

13  1246-1249).  The ALJ found Dr. Cohen's opinion was inconsistent with Plaintiff's reported

14  activities.  (AR 31).  An ALJ properly may consider a plaintiff's reported activities in evaluating

15  the persuasiveness of medical opinions.  *See Leonard v. Comm'r of Soc. Sec.*, No. 1:21-cv-00627-

16  EPG, 2022 WL 4123990, at *4 (E.D. Cal. Sept. 9, 2022) ("when considered in conjunction with

17  the rest of the ALJ's reasoning, the ALJ's reliance on Plaintiff's daily activities—caring for her

18  cat, preparing simple meals, cleaning, and sometimes administering her father's insulin, etc.—is a

19  reasonable basis to discount the severe limitations assessed [in a medical opinion]").

20     Plaintiff argues that the ALJ did not explain how her daily activities are inconsistent with

21  Dr. Cohen's opinion.  She asserts that a "treating source opinion that a claimant is unable to work

22  full-time does not mean that a claimant must be bed-ridden and comatose."  (Doc. 14 at 26).  If

23  the ALJ had solely relied on Plaintiff's daily activities to reach her conclusion, Plaintiff's

24  argument would be more persuasive.  However, the ALJ's analysis of Plaintiff's daily activities is

25  simply one factor in her conclusion.  As discussed in the subsections above, the ALJ evaluated

26  numerous other factors as well, such as extensive medical records relating to Plaintiff's course of

27  treatment over the years, and her hips, lumbar spine, pain treatments, and medications.

28     Accordingly, the ALJ's evaluation of Dr. Cohen's opinion as to daily activities is

1  supported by substantial evidence.

2  **B.  Whether the ALJ Erred in Finding That Plaintiff's Chronic Kidney Stones Were**

3  **a Non-Severe Impairment at Step Two of the Analysis and Failed to Include**

4  **Limitations Related to That Impairment**

5  As to Plaintiff's kidney stones, the ALJ found:

6  The claimant has a long history of recurrent kidney stones, for which she underwent
   multiple shock wave lithotripsies.  However, the vast majority of these episodes
7  occurred prior to March 1, 2013.  There is little objective evidence that, since March
   1, 2013, this condition has lasted or can be expected to last for a continuous period
8  of not less than 12 months.  In addition, the record contains little evidence of
   significant, ongoing complications related to these conditions since March 1, 2013.
9  Because this condition causes no more than minimal limitations in the claimant's
10  ability to perform basic work activities, I find that it is non-severe.

11  (AR 24) (citations omitted).

12  Plaintiff argues that the ALJ erred in finding that Plaintiff's kidney stones did not meet the

13  duration requirement for a severe impairment.  In support of her contention, Plaintiff cites to

14  records evidencing an admission to the hospital from January 21, 2020, to January 23, 2020, for

15  "right ureteral stone, right flank pain, hydronephrosis of the right kidney, and dehydration with

16  hyponatremia, morbid obesity, and acute pyelonephritis", as well as "right hydronephrosis, right

17  ureteral stone, and left nephrolithiasis."  (Doc 14 at 27, citing AR 1913-1914, 1916).  Plaintiff

18  underwent a "cystoscopy[] and right ureteral JJ stent insertion to treat proximal ureteral calculus."

19  *Id.* (citing AR 1944-1945).

20  Plaintiff further argues that the ALJ failed to address related abdominal issues, namely

21  "diverticulosis, Barrett's esophagus, hiatal hernia, and vomiting and diarrhea related to her gastric

22  bypass surgeries," being treated for them in 2018 and 2019.  *Id.* at 27-28 (citing AR 779-80, 796-

23  797, 1748-1749, 1754, 1763-1764).  Plaintiff states that "[t]he ALJ's error in finding Plaintiff's

24  chronic kidney stones non-severe carries through the case as the ALJ then failed to assess

25  Plaintiff's subjective complaints of chronic stomach pain, vomiting, and diarrhea" and the lack of

26  corresponding RFC limitations requires remand.  *Id.* at 30.

27  "The plaintiff has the burden of establishing the severity of the impairment."  *Cookson v.*

28  *Comm'r of Soc. Sec.*, No. 2:12-cv-2542-CMK, 2014 WL 4795176, at *2 (E.D. Cal. Sept. 25,

20

2014).  Applying the normal standard of review to the requirements of step two, the Court must determine whether the ALJ supported with substantial evidence her finding that the medical records clearly established that Plaintiff's kidney stones did not constitute a medically severe impairment. *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988).

The ALJ states that there is little evidence that Plaintiff's conditions regarding kidney stones can be expected to last for a continuous period not less than 12 months.  She states that the vast majority of Plaintiff's recurrent kidney stones occurred prior to the date of onset of her disability and that, since then, there is little evidence of "significant, ongoing complications" related to kidney stones, resulting in it not causing more than minimal limitations to her ability to perform basic work activities.  (AR 24).

The record supports the ALJ's findings.  Plaintiff is correct in that records show a visit by Plaintiff to the hospital regarding kidney stones in late January 2020, including as to all the conclusions and procedures made by healthcare practitioners therefrom.  In those records, physician Dennis Gardner states that Plaintiff has a history of kidney stones and Plaintiff stated that "this feels similar to previous from six years ago."  (AR 1923).  On a return visit to the hospital on February 1, 2020, physician Chi K. Poon notes that "mild right-sided hydronephrosis is seen and has improved significantly from the prior examination."  (AR 2219).  On April 27, 2019, Plaintiff visited the hospital for gastrointestinal issues; physician Erin Elizabeth Lensch noted "nonobstructive nephrolithiasis" in her kidneys.  (AR 1792, 1803).  On August 27, 2019, Plaintiff visited gastroenterologist Magdy S. Elsakr for a follow-up, who also noted a nonobstructive nephrolithiasis and did not include kidney stones in his list of medical conditions, and recorded that Plaintiff previously had kidney stones removed in September 2015.  (AR 1765-1766).

In one of the earliest relevant records, dated March 4, 2013, and prepared by physician Joey C. Chang, Plaintiff is diagnosed with a "calyceal calculi 2 mm proximal right ureteral calculus, mild left perinephric stranding and thickening of the left ureter."  (AR 2741).  A record from November 8, 2014, prepared by physician Arturo Soria states a diagnosis of kidney stones. (AR 694, 2726).  A record from December 18, 2014, prepared by physician Ian Norman

21

1    Fauconier notes bilateral nephrolithiasis and that Plaintiff "has passed multiple stones in the past

2    and is interested in attempting to pass this stone as well." (AR 657). A record from January 15,

3    2015, references the November 8, 2014, diagnosis and notes that Plaintiff stated she passed

4    multiple kidney stones in the past and attempted to pass this one as well but had not yet, and thus

5    wished to proceed with endoscopic stone removal (AR 2713); a substantially similar record from

6    January 25, 2015, states the same, with a handwritten note mentioning that "Dr. Dewar will do

7    surgery. 2/20/15." (AR 2687). A record prepared by physician C. R. Dewar notes a cystoscopy

8    and bilateral ureteroscopy performed on February 20, 2015. (AR 2692-2693).

9        A record from April 3, 2015, prepared by Dr. Fauconier documents a post-operation visit,

10   noting no residual ureteral calculi remaining, and proceeding with a metabolic stone evaluation.

11   (AR 647). A record from May 27, 2015, prepared by Dr. Fauconier reflects a recheck visit,

12   discussing clinical findings from a previous visit and directing continuation of stone prevention

13   measures, return appointment projected in six to eight months. (AR 646). A record from

14   September, 2015, prepared by physician Ricky Bassi notes nephrolithiasis and ureteral stone

15   under "[a]ctive [p]roblems" but does not discuss any further. (AR 615). A record signed by

16   physician Alexander Scott for service provided on January 22, 2016, found stable bilateral

17   nephrolithiasis. (AR 691). A record from January 29, 2016, noted a right-sided lithotripsy,

18   followed by a contralateral lithotripsy. (AR 637). A record from March 8, 2016, prepared by Dr.

19   Bassi notes nephrolithiasis and ureteral stone under "[a]ctive [p]roblems" but does not discuss

20   any further (AR 611); as does a record from June 8, 2016 (AR 607).

21       It appears from the record that Plaintiff did not have a severe kidney stone condition for at

22   least 12 consecutive months. The record shows significant gaps between treatments; Plaintiff did

23   not identify, and the Court cannot find, a continuous 12-month period where kidney stones caused

24   Plaintiff severe impairments. Though Plaintiff cites a more recent kidney stone treatment which

25   was not mentioned by the ALJ, the ALJ need not mention each visit to properly determine that

26   Plaintiff's condition did not meet the duration requirement for a disability. *See Wesley M. v.*

27   *Colvin*, No. 4:24-CV-05044-ACE, 2024 WL 5126270, at *6 (E.D. Wash. Dec. 16, 2024)

28   (concluding in a similar case that the ALJ sufficiently considered the plaintiff's kidney stone

history and correctly assessed the record reflected the plaintiff did not have a severe kidney stone condition for at least 12 consecutive months; holding "the condition did not meet the durational requirement for a severe medically determinable impairment.") (citations omitted); *see also Holt v. Kijakazi*, No. 3:23-CV-00162-LRH-CLB, 2024 WL 1420749, at *6 (D. Nev. Jan. 4, 2024), report and recommendation adopted, No. 323CV00162LRHCLB, 2024 WL 1420600 (D. Nev. Apr. 2, 2024) ("Although Holt testified that she has kidney stones 'all the time,' the medical records first establish Holt has a kidney stone on February 25, 2021, but that her 'initial stone episode was years ago.' On August 26, 2021, Holt was noted as developing sharp pains only two days prior. From this evidence, it is entirely reasonable for the ALJ to conclude that Holt's kidney stones were non-severe because they did not cause continuous severe impairments for a twelve-month period.") (citations omitted).

Finally, it follows that, as to Plaintiff's claim that the ALJ failed to assess Plaintiff's subjective pain complaints, vomiting, and diarrhea when determining that Plaintiff's chronic kidney stones were non-severe, as noted above, the record evidence does not establish a 12-month period where such issues, in conjunction with kidney stones, resulted in severe impairments.[3]

*     *     *     *     *

In sum, the ALJ supported her discounting of Dr. Cohen's medical opinion with substantial evidence and properly found Plaintiff's kidney stones to be a non-severe impairment.

*Remainder of This Page Intentionally Left Blank*

---

[3] Although Plaintiff makes passing reference in her motion to the ALJ's purported improper discounting of Plaintiff's testimony (Doc. 14 at 29, 30), no argument is fully developed on this point and, thus, the Court will not address the issue. *See Martinez v. Comm'r of Soc. Sec.*, No. CIV S-08-1308-CMK, 2010 WL 1286721, at *16 (E.D. Cal. Mar. 29, 2010); *see also Najar v. Kijakazi*, No. 2:21-CV-01096-DJA, 2022 WL 1014960, at *4 (D. Nev. Apr. 4, 2022) ("Plaintiff also argues that to the extent the Court finds the 'frequent' RFC determination to be supported by substantial evidence, the ALJ failed to encompass Dr. Rager's opinion that Plaintiff would act inappropriately around others into the RFC … However, this argument is not fully developed, nor is it necessary for the Court to address, because Plaintiff argues it in the alternative. As a result, the Court will not address the issue.") (citations omitted).

1  **IV.    CONCLUSION**

2      Accordingly, IT IS HEREBY ORDERED that:

3      1.      Plaintiff's motion for summary judgment (Doc. 14) is DENIED;

4      2.      The ALJ's decision is affirmed; and

5      3.      The Clerk of the Court shall enter judgment in favor of Defendant, terminate any

6          deadlines, and close this case.

7  IT IS SO ORDERED.

8      Dated:    **February 27, 2025**

9                          UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28